**FORT WORTH REFINING COMPANY**

v.

**The UNITED STATES.**

**No. 351–69.**

United States Court of Claims.

June 11, 1971.

Davis, J., filed concurring opinion joined by Laramore, J.; Nichols, J., filed opinion concurring in part and dissenting in part.

John C. Nabors, Houston, Tex., for plaintiff. W. Robert Brown, Houston, Tex., attorney of record. Liddell, Sapp, Zively & Brown, Houston, Tex., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendations for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on December 10, 1971. Plaintiff filed exceptions to certain of the commissioner's findings of fact as to the damages issue which would result in an increase in the award, but otherwise requested that the court adopt his opinion, findings and recommended conclusion as the basis for its judgment in the case. Defendant filed exceptions to certain findings of fact and urged that the court dismiss plaintiff's petition. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion, findings of fact and recommended conclusion of law of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $77,655.21.

---

* The concurring opinion of Davis, *Judge*, in which Laramore, *Judge*, joins and the opinion of Nichols, *Judge*, concurring in part and dissenting in part, follow the opinion of the trial commissioner which has been adopted by the court.

## OPINION OF COMMISSIONER

WHITE, Commissioner:

The plaintiff, which owns and operates a small petroleum refinery in Fort Worth, Texas, is suing the defendant for additional compensation in connection with the furnishing by the plaintiff of 15,531,042 gallons of jet fuel to Barksdale Air Force Base, which is located in the vicinity of Shreveport, Louisiana.

It is my opinion that the plaintiff is entitled to recover.

The present controversy had its genesis in the issuance by the Defense Fuel Supply Center ("the DFSC") of Solicitation No. DSA–600–69–B–0043 ("the solicitation") on August 2, 1968. The solicitation (as subsequently amended) solicited bids for the supply of approximately 2,600,000,000 gallons of jet fuel, JP–4, in order to meet the requirements of approximately 300 federal installations in the United States and in certain foreign countries during the first half of 1969. Bids were to be opened on September 5, 1968. Various items in the solicitation contained set-asides for small businesses.

Item 151 of the solicitation solicited bids for the supply of 40,000,000 gallons of jet fuel to Barksdale Air Force Base. Half of this quantity (i. e., 20,000,000 gallons) was set aside to be furnished by small businesses.

The small business set-aside procedure to be used in connection with the solicitation was the "matched price method" described in ASPR Deviation 68–11. Under this procedure, the Defense Fuel Supply Center offered to purchase the set-aside portion of a procurement (in this case, 20,000,000 gallons of jet fuel for Barksdale Air Force Base) from small businesses at the price which the Government would have had to pay if there had been no set-aside.

The plaintiff, which is a small business concern, submitted bids on several items contained in the solicitation, including Item 151 relating to the supply of jet fuel for Barksdale Air Force Base. On Item 151, the plaintiff offered to supply a total of 17,000,000 gallons of jet fuel for Barksdale Air Force Base at a lay-down price of 11.45 cents per gallon.

Another bidder on Item 151 of the solicitation was Triangle Refineries, Inc. ("Triangle"), which is a subsidiary of Kerr-McGee Corporation and is not a small business concern. Triangle broke its bid into two 20,000,000-gallon increments. It offered to supply the initial increment of 20,000,000 gallons (the equivalent of the non-set-aside portion of Item 151) at a lay-down price of 11.3203 cents per gallon, and to supply the second increment of 20,000,000 gallons (the equivalent of the set-aside portion of Item 151, for which Triangle was not eligible) at a lay-down price of 10.3303 cents per gallon. However, Triangle's bid on the second 20,000,000-gallon increment was conditioned upon the acceptance of Triangle's offer to supply the first 20,000,000-gallon increment at the higher price of 11.3203 cents per gallon. Thus, Triangle's bid, if accepted, would not obligate Triangle to supply any jet fuel for Barksdale Air Force Base at a price of 10.3303 cents per gallon until after Triangle had first supplied 20,000,000 gallons at the higher price of 11.3203 cents per gallon.

Triangle, being the low bidder, was awarded a contract for the supply of the 20,000,000-gallon non-set-aside portion of the jet fuel for Barksdale Air Force Base under Item 151 of the solicitation, at a price of 11.3203 cents per gallon.

The plaintiff was the low bidder among the small businesses that submitted bids on Item 151 of the solicitation for the supply of jet fuel to Barksdale Air Force Base. After learning of Triangle's bid through some private person who attended the bid opening, the plaintiff got in touch with the Defense Fuel Supply Center by means of two or more longdistance telephone calls, and inquired as to whether, on the portion of

Item 151 that was set aside for small businesses, the plaintiff would have to meet Triangle's conditional bid of 10.-3303 cents per gallon. The plaintiff ultimately received an affirmative reply to its inquiry.

When the plaintiff realized that it (a small business concern) would be offered the set-aside portion of Item 151 of the solicitation at a price lower than the price that would be paid to Triangle (a substantial business concern) on the non-set-aside portion, the plaintiff objected to the contracting officer. Also, by means of a letter dated October 10, 1968, the plaintiff protested to the Comptroller General and asked such official to review the procedure which the contracting officer proposed to follow.

The plaintiff's protest to the Comptroller General brought to a standstill the process of making awards on the various items under the solicitation. This information was conveyed to the plaintiff by the Defense Fuel Supply Center, which requested the plaintiff's cooperation in creating a situation that would permit the making of awards to go forward. The plaintiff indicated a willingness to cooperate; and it was suggested by the DFSC that a communication to this effect be sent by the plaintiff to the Comptroller General.

In a letter dated October 15, 1968, the plaintiff advised the Comptroller General that it did not wish to delay the making of contract awards under the solicitation; that the plaintiff would take a contract to supply a substantial amount of jet fuel under the solicitation regardless of the price; and that the plaintiff desired to negotiate with the Defense Fuel Supply Center under its then-current procedure, but subject to the final decision of the Comptroller General on the plaintiff's protest. In addition, the plaintiff sent a similar message to the DFSC by means of a telegram dated October 15, 1968. The telegram also confirmed an understanding between the plaintiff and the DFSC to the effect that the DFSC would make a retroactive price adjustment upward in the plaintiff's contract if the Comptroller General upheld the plaintiff's protest.

When no decision from the Comptroller General on the plaintiff's protest was forthcoming by mid-December of 1968, the Defense Fuel Supply Center issued a final contract award to the plaintiff on 16,078,000 gallons of the set-aside portion of Item 151 of the solicitation, at a price of 10.3303 cents per gallon. However, the contract contained a proviso allowing an upward adjustment in the contract price if the Comptroller General subsequently sustained the plaintiff's protest.

The plaintiff made its first shipment of jet fuel to Barksdale Air Force Base under the contract on January 2, 1969. The plaintiff eventually supplied a total of 15,531,042 gallons of jet fuel to Barksdale Air Force Base pursuant to the contract, and received a price of 10.3303 cents per gallon for this fuel, or a total of $1,501,776.12.

On January 16, 1969, the Comptroller General issued decision B–165422 denying the plaintiff's protest relative to Item 151 of the solicitation. The present litigation followed.

In the light of the governing regulation, the primary problem in the present case is to determine what the defendant would have had to pay for the jet fuel which the plaintiff supplied to Barksdale Air Force Base if there had been no set-aside under Item 151 of the solicitation.

Triangle's actual bid indicated that Triangle was able and willing to supply— and, indeed, was desirous of supplying— the entire 40,000,000 gallons of jet fuel required by Barksdale Air Force Base during the first half of 1969 at an overall average lay-down price of 10.8253 cents per gallon. On the other hand, Triangle's actual bid indicated that Triangle was not willing to supply any jet

fuel to Barksdale Air Force Base unless it received an overall average lay-down price of at least 10.8253 cents per gallon. Thus, it is reasonable to infer that Triangle would have submitted an offer—and would have received a contract—to supply 40,000,000 gallons of jet fuel for Barksdale Air Force Base at a lay-down price of 10.8253 cents per gallon if Item 151 of the solicitation had called for bids on 40,000,000 gallons of jet fuel, without any set-aside for small businesses.

In this connection, it is also reasonable to infer that, in submitting the incremental bid on Item 151 of the solicitation and in offering to supply the second increment of 20,000,000 gallons of jet fuel (the equivalent of the set-aside portion of Item 151 of the solicitation) at a price 1 cent per gallon less than the price quoted on the first increment of 20,000,-000 gallons (the equivalent of the non-set-aside portion of Item 151), Triangle was motivated by a desire to deter small businesses from negotiating with the Defense Fuel Supply Center for the set-aside quantity of 20,000,000 gallons of jet fuel. Triangle knew that its quotation of 10.3303 cents per gallon on the second increment was conditioned upon the Government's first purchasing the initial increment of 20,000,000 gallons from Triangle at a price of 11.3203 cents per gallon, so that Triangle would receive an overall average lay-down price substantially in excess of 10.3303 cents per gallon (and not less than 10.8253 cents in any event) for any and all jet fuel which it supplied to Barksdale Air Force Base.

Triangle's bid was so unusual as to be unique in the Government's experience of receiving bids for the supply of jet fuel. Except for this particular bid submitted by Triangle, it has been the experience of the Government that when an oil company submits an incremental bid for the supply of jet fuel, the bidder invariably quotes a specified price for the first increment, then quotes a higher price for the second increment, and quotes increasingly higher prices for any other increments. This normal bidding pattern on incremental bids for the supply of jet fuel is attributable to the factors mentioned in the immediately succeeding paragraph.

Jet fuel is a blend of kerosene and straight-run naphthas. In refining a barrel of crude oil, a petroleum refinery will normally convert only a relatively small percentage of the crude oil into jet fuel. Most of the crude oil will normally be converted into other petroleum products—such as gasoline—that have a higher economic value than jet fuel. When a refinery revises its customary manufacturing procedure in order to produce from a barrel of crude oil a higher percentage of jet fuel than the percentage normally produced, it is necessary for the refinery to divert to jet fuel certain components which would ordinarily be utilized in the manufacture of petroleum products having a higher economic value than jet fuel. In such a situation, the price of the jet fuel has to be increased above the refinery's customary price in order to make the production of the increased quantity of jet fuel economically feasible.

Thus, although Triangle's conditional bid on Item 151 of the solicitation was in the form of an incremental bid, it was, in substance, an attempt to obtain a contract to supply 40,000,000 gallons of jet fuel for Barksdale Air Force Base at a lay-down price of 10.8253 cents per gallon.

With respect to the jet fuel which the plaintiff supplied to Barksdale Air Force Base under Item 151 of the solicitation, the evidence shows that if the Government had paid the plaintiff a price equivalent to the overall average lay-down price of 10.8253 cents per gallon quoted by Triangle on 40,000,000 gallons of jet fuel for Barksdale Air Force Base, the plaintiff would have received $77,-655.21 more than the plaintiff actually received. This should be the measure of the plaintiff's recovery in the present case, under the governing regulation.

It is true that in the contract which the plaintiff signed with the Defense Fuel Supply Center, the plaintiff agreed to supply jet fuel to Barksdale Air Force Base at a lay-down price of 10.3303 cents per gallon, subject to the final decision of the Comptroller General on the plaintiff's protest (which decision was ultimately adverse to the plaintiff's position). However, the action of the DFSC in requiring the plaintiff to accept a price of 10.3303 cents per gallon was contrary to, and violated, the provisions of the governing regulation and, accordingly, must be overturned in the present judicial proceeding.

In connection with the matter mentioned in the preceding paragraph, it is pertinent to note that in the negotiations between the plaintiff and the Defense Fuel Supply Center regarding the price that would be payable to the plaintiff, the plaintiff never made any commitment that it would not attempt to overturn the decision of the Comptroller General on the plaintiff's protest if such decision was adverse to the plaintiff's position.

For the reasons previously set out in this opinion, judgment should be entered for the plaintiff in the amount of $77,655.21.

DAVIS, Judge (concurring):

I join the court in adopting Commissioner White's opinion but, in view of the dissent, wish to add some sentences on damages.[1] The cardinal point is that plaintiff has the burden of showing that it is entitled to more than the commissioner allowed. To my mind, it has not made that proof, on either of the two potentially available hypotheses. The Invitation for Bids provided: "Small business concerns will be offered the set-aside portion at prices (appropriately adjusted to reflect transportation and any other applicable evaluation cost factors) which will represent what the Government would otherwise have had to pay, pursuant to such evaluation, had there been no set-aside." The parties do not discuss whether the Government, under this form of invitation, could validly decide, after all the bids were filed and opened, to cancel the set-aside and make the award (on the basis of the already-submitted bids) as if "there had been no set-aside." If that could be done, the price of 10.8253 cents per gallon (the sum allowed by Commissioner White) would best represent "what the Government would otherwise [i. e. the set-aside being itself set aside] have had to pay." On the other hand, if the quoted part of the invitation means that the trier-of-fact must determine what the defendant would have had to pay if bids had been originally requested without any reference to a set-aside, I think that plaintiff has also failed to carry its burden. True, Triangle must have assumed that 11.3203 cents would be the lowest bid under the invitation containing the set-aside. But that is not proof that Triangle would have made the same assumption in the total absence of a set-aside. In the latter situation, Triangle could well have been faced with competition from other larger companies which would desire to supply the entire 40 million gallons, but were not interested in getting only the non-set-aside portion of 20 million gallons and therefore refrained from bidding at all on the invitation as it was actually issued. The record demonstrates that Triangle was most anxious to obtain the whole 40 million if it possibly could— and therefore would surely have sought to underbid any such larger competitor— and there is no hint that the average price of 10.8253 cents it in fact bid was below-cost or excluded a profit. Because of these factors, my judgment is that plaintiff has failed to demonstrate that Triangle, in the hypothetical circumstances, would necessarily or probably

1. Judge Nichols is plainly right, in my view, in rejecting the Government's argument, based on ASPR Deviation 68–11, that plaintiff should get less than the commissioner awarded.

have bid 11.3203 rather than 10.8253 for all of the 40 million gallons.

LARAMORE, Judge, joins in the foregoing concurring opinion of Judge Davis.

NICHOLS, Judge (concurring in part, dissenting in part).

I agree with the court that the plaintiff is entitled to relief. However, in determining quantum, with all respect I would make the ultimate finding that but for the set-aside the price defendant would have had to pay would have been not under 11.32 cents per gallon, after adjustment.

Defendant's officers treated as part of the IFB (Finding 2) example B of the "matched price method" approved as part of ASPR Deviation 68–11, which example read as follows:

1. *Total Quantity to be Procured*    1,000
   Non-Set-Aside Portion    500
   Set-Aside Portion    500

2. *Bids Received*

| *Large Business Bids* | | | | *Small Business Bids* | | |
|---|---|---|---|---|---|---|
| Bidder | Quantity | Bid | | Bidder | Quantity | Bid |
| A | 500 | $.09 | | 1 | 500 | $.0925 |
| B | 500 | .092 | | 2 | 500 | .0950 |

3. *Award of Non-Set-Aside*

| Bidder | Quantity | Price |
|---|---|---|
| A | 500 | $.09 |

4. *Prices Which Must be Matched*
   500 at $.092    (Higher than under ASPR procedure)

I construe it as not applicable to the facts here found because the example evidently presupposes that the identity of bidders A and B are not the same. Nevertheless, defendant treated Triangle's lower bid for the set-aside portion as if it were someone else's higher bid for the non-set-aside portion.

I see in Commissioner White's findings in their totality clear evidence that no one would have bid for any part of the 40,000,000 gallons for Barksdale AFB any price under 11.32, which Triangle quoted for the non-set-aside portion, if defendant had not made a set-aside. This makes 11.32 the standard plaintiff must meet. The court's theory, as I understand it, is that plaintiff might have refused any award below its bid of 11.45 and in that event Triangle would have obliged itself to deliver the entire 40,000,000 gallons at an average price of 10.8253. Triangle's obvious purpose was to drive the small businesses out of competition by squeezing out their profit. In the absence of a set-aside, it would have had no motive to do this.

The set-aside had already been made as the IFB itself stated, and no price so obviously quoted in reaction to the set-aside can be deemed to indicate what the quotation would have been in absence of a set-aside. Even if the set-aside portion had ultimately gone to Triangle at its 10.3+ bid, this would not have been the situation "had there been no set-aside." That no award of the set-aside portion could be made to a small business, because of Triangle's tactics, would not have undone the fact that a portion of the procurement had once been set-aside. Thus I do not deem that Triangle's reduced price for the set-aside portion is for any kind of consideration in deter-

mining what the price would have been in absence of set-aside, not by averaging or weighting any more than by using it as the sole determinant.

The court is, I think, rewriting the words "had there been no set-aside" to make them read "had there been no award to a small-business concern pursuant to a set-aside."